2005 ND 104

**PEOPLE TO SAVE THE SHEYENNE RIVER, INC. and the Government of the Province of Manitoba, Plaintiffs and Appellants,**

v.

**NORTH DAKOTA DEPARTMENT OF HEALTH, and North Dakota Water Commission, Defendants and Appellees.**

**Peterson Coulee Outlet Association, Plaintiff and Appellant,**

v.

**North Dakota Department of Health, and North Dakota Water Commission, Defendants and Appellees.**

Nos. 20040376, 20040377.

Supreme Court of North Dakota.

June 2, 2005.

William J. Delmore (argued), Kelsch, Kelsch, Ruff & Kranda, Mandan, ND; and Daniel E. Buchanan (appeared), Buchanan Law Office, Jamestown, ND, for plaintiff and appellant, People to Save the Sheyenne River.

Richard A. Wegman (appeared) and Eldon Greenberg (appeared), Washington, D.C., for plaintiff and appellant, Government of the Province of Manitoba.

Dean J. Haas (argued), Office of Attorney General, Bismarck, ND, for defendant and appellee, North Dakota Department of Health.

Matthew Arnold Sagsveen (argued), Office of Attorney General, Bismarck, ND, for defendant and appellee, North Dakota State Water Commission.

Joseph J. Cichy (appeared), Olson Cichy Bliss, Bismarck, ND, for plaintiff and appellant, Peterson Coulee Outlet Association.

Cynthia Wagner Goulet (on brief), Mandan, ND; Richard P. Cool (on brief) and Jill Schlick (on brief), Assistant Attorneys General, Office of Minnesota Attorney General, St. Paul, MN, for amicus curiae Minnesota Department of Natural Resources and Minnesota Pollution Control Agency.

VANDE WALLE, Chief Justice.

[¶ 1] The Government of the Province of Manitoba, the People to Save the Sheyenne River, Inc., and the Peterson Coulee Outlet Association appealed from a district court judgment affirming a decision by the North Dakota Department of Health to grant the North Dakota State Water Commission a permit for an outlet to discharge water from Devils Lake into the Sheyenne River. We conclude the Health Department's issuance of the permit was not arbitrary, capricious, or unreasonable under the statutory scheme for the issuance of this permit, and we affirm.

I

[¶ 2] Devils Lake is a 125,000 acre lake in northeastern North Dakota. The lake is located within the Hudson Bay drainage basin, but it has no natural outlet and currently is not hydrologically connected to any other surface waters in the Hudson Bay basin. Devils Lake is about fifteen miles from the Sheyenne River, which is a tributary to the Red River. The Sheyenne River generally flows in a southeasterly direction and forms Lake Ashtabula at the Bald Hill Dam, which is about 270 miles upstream from the Sheyenne River's confluence with the Red River. The Red River forms the boundary between North Dakota and Minnesota and flows north across the Canadian border into Lake Winnipeg in Manitoba, which in turn drains into the Hudson Bay.

[¶ 3] Because Devils Lake has no natural outlet, the water level of the lake generally increases during wet periods and decreases during dry periods. Since 1993, the Devils Lake area has received above normal precipitation, and Devils Lake has risen nearly 25 feet in elevation, which has resulted in the flooding and the destruction or relocation of numerous homes, businesses, and roads near Devils Lake. A three-pronged approach has been developed to provide relief from the flooding, including infrastructure protection, upper-basin water storage, and an outlet to the Sheyenne River.

[¶ 4] In 1997, Congress directed the United States Army Corps of Engineers to "initiate and complete preconstruction engineering and design and the associated Environmental Impact Statement for an emergency outlet from Devils Lake ... to the Sheyenne River." Act of June 12, 1997, Pub.L. No. 105–18, 1997 U.S.C.C.A.N. (111 Stat.) 176. In April 2003, the Corps of Engineers issued a final integrated planning report and environmental impact statement for a proposed outlet on the east side of Devils Lake to the Sheyenne River. The Corps of Engineers' proposed outlet would have resulted in a 300 cubic feet per second discharge into the Sheyenne River with an estimated cost of about $186.5 million. The Corps of Engineers did not construct this outlet project.

[¶ 5] In 1999, the North Dakota Legislature authorized the construction of a state outlet project. See 1999 N.D. Sess. Laws ch. 535, § 3. In August 2002, the Water Commission applied to the Health Department for a North Dakota Pollutant Discharge Elimination System ("NDPDES") permit for the construction and operation of a state outlet from the West Bay of Devils Lake into the Sheyenne River. The Health Department con-

ducted an environmental review of the project and issued a public notice and intent to issue a permit for the state outlet. The Health Department's notice identified two public hearings to solicit comments prior to the finalization of permit conditions. Public hearings were held on May 20, 2003, in Devils Lake, and on May 21, 2003, in Valley City, before L. David Glatt, the Chief of the Environmental Health Section of the Health Department. The Health Department also received written comments about the project and prepared written responses to the comments. In July 2003, Glatt recommended issuing the Water Commission a permit for the state outlet, subject to several conditions.

[¶ 6] In August 2003, the Health Department approved the recommendation to issue the Water Commission a permit for the state outlet. The approved permit limits the initial discharge rate to 50 cubic feet per second during the first year of operation of the outlet and requires establishment and implementation of an adaptive management program to ensure compliance with permit requirements and applicable water standards. After the first year of operation, the permit requires submission of a final draft of the adaptive management plan to the Health Department for approval. Upon approval by the Health Department, the adaptive management plan will become part of the permit and the discharge rate may be increased to 100 cubic feet per second. The permit also requires biological assessments of the ecological condition of the Sheyenne River at four different points, and an intake screen to prevent the transfer of adult fish species to the Sheyenne River. The permit limits operation of the state outlet to May through November and precludes any dis-

charge when the elevation of Devils Lake is below 1445 feet. The outlet is scheduled to begin operation in the summer of 2005, and the permit authorizes operation of the outlet through June 2008.

[¶ 7] Several parties who opposed the permit filed petitions for reconsideration under N.D.C.C. § 28–32–40. The Health Department reopened the administrative record for further comments, responded to comments received after the record was reopened, and decided the permit would remain in effect as originally issued. Manitoba and the People to Save the Sheyenne River appealed to the district court. The Peterson Coulee Outlet Association separately appealed to the district court. The appeals were consolidated, and the Minnesota Department of Natural Resources, the Minnesota Pollution Control Agency, and the Minnesota Attorney General participated in the district court as amici curiae. The district court affirmed the Health Department's decision to issue the Water Commission a permit for the state outlet. Manitoba, the People to Save the Sheyenne River, and the Peterson Coulee Outlet Association (hereinafter collectively referred to as "Manitoba") appealed, and the Minnesota Department of Natural Resources, the Minnesota Pollution Control Agency, and the Minnesota Attorney General appeared as amici curiae.[1]

II

[¶ 8] Our examination of the appeal requires that we outline in detail issues about our standard of review and the procedure for the review and issuance of a NDPDES permit in conjunction with Manitoba's claim the Health Department failed to conduct the permitting process in accordance with the law.

---

1. Our analysis of the issues raised by the amici curiae is limited to the issues raised by Manitoba. See N.D.R.App.P. 29(a).

[¶ 9] As relevant to this case, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, prohibits the discharge of any pollutant from a point source to surface waters except when the discharge complies with a National Pollutant Discharge Elimination System permit. *See* 33 U.S.C. §§ 1311(a) and 1342. The United States Environmental Protection Agency has delegated authority to the Health Department to issue NDPDES permits as part of the Clean Water Act. *See* 33 U.S.C. § 1342(b). In issuing a permit, the Health Department must comply with federal law. *See* 33 U.S.C. § 1342(b).

[¶ 10] The Health Department issues NDPDES permits under the authority granted in N.D.C.C. ch. 61–28, which relates to the control, prevention, and pollution abatement of surface waters. Section 61–28–04, N.D.C.C., designates the Health Department as the state water pollution control agency and authorizes the Health Department to make rules governing the issuance, denial, modification, or revocation of permits and to hold hearings necessary for the proper administration of N.D.C.C. ch. 61–28. Section 61–28–06, N.D.C.C., prohibits the construction of an outlet for the discharge of any wastes into the waters of this state without a valid permit.

[¶ 11] Under the authority in N.D.C.C. ch. 61–28, the Health Department has promulgated N.D. Admin. Code. ch. 33–16–01, which establishes procedures for the application for, and the issuance, denial, and modification of NDPDES permits. N.D. Admin. Code § 33–16–01–01(2). Those provisions require notice and public participation for tentative determinations and draft permits, a period for public comment, a requirement for responses to comments, the preparation of fact sheets for applications, notice to appropriate government agencies, and public hearings for applications involving significant public interest. *See* N.D. Admin. Code §§ 33–16–01–06, 33–16–01–07, 33–16–01–07.1, 33–16–01–08, 33–16–01–09, 33–16–01–10, and 33–16–01–11.

[¶ 12] Section 61–28–07, N.D.C.C., provides:

Any proceeding under this chapter for issuance or modification of rules, including emergency orders relating to control of water pollution or for determining compliance with or violation of this chapter, or adoption of any rule or order under this chapter by the department, must be conducted in accordance with chapter 28–32. Any person claiming to be aggrieved or adversely affected by actions taken, or by any rule or order issued under this chapter may request a hearing by the department. There is a right of appeal to the district court from any adverse ruling by the department.

[¶ 13] Chapter 28–32, N.D.C.C., is the Administrative Agencies Practices Act, and the Health Department is an administrative agency governed by its procedures. *See* N.D.C.C. § 28–32–01(2) (defining administrative agency). The Act generally outlines procedures for an "adjudicative proceeding," which was previously called a "contested case." *See* 2001 N.D. Sess. Laws ch. 293, §§ 12 and 35. An adjudicative proceeding is now defined in N.D.C.C. § 28–32–01(1) to mean an administrative matter resulting in an agency issuing an order after an opportunity for hearing is provided or required and includes administrative matters involving a hearing on an application seeking a right, privilege, or authorization from an agency, including a licensing hearing. A license is defined in N.D.C.C. § 28–32–01(6) as a permit, or similar form of authorization required by law. The Act generally contemplates an adjudicative proceeding for issuance of a permit.

[¶ 14] Section 28–32–21, N.D.C.C., outlines procedures for an adjudicative proceeding, including the right to present evidence and cross-examine witnesses under N.D.C.C. §§ 28–32–24 and 28–32–35. Section 28–32–21(1), N.D.C.C. describes the procedure for an adjudicative proceeding involving a hearing on a complaint against a specific-named respondent, and N.D.C.C. § 28–32–21(3) outlines the procedure for an adjudicative proceeding that does not involve a complaint against a specific-named respondent. An agency may dispose of any adjudicative proceeding by informal disposition, unless otherwise prohibited by statute or rule. N.D.C.C. § 28–32–22. The admissibility of evidence in any adjudicative proceeding is generally governed by the North Dakota Rules of Evidence. N.D.C.C. § 28–32–24(1). In any adjudicative proceeding, an agency may consider competent or relevant information in its possession or furnished by members of its staff in addition to evidence presented at a hearing. N.D.C.C. § 28–32–25. The person presiding at a hearing shall regulate the hearing in conformity with N.D.C.C. ch. 28–32 and any rules adopted by the agency, and any other applicable laws. N.D.C.C. § 28–32–35. An agency must make a record of all testimony, written statements, documents, exhibits, and other evidence presented at any adjudicative proceeding, or other administrative proceeding heard by the agency. N.D.C.C. § 28–32–36. In any adjudicative proceeding, an agency shall make findings of fact, conclusions of law, and an order based upon its findings and conclusions. N.D.C.C. § 28–32–39.

[¶ 15] Any party before an administrative agency who is aggrieved by the agency's final order may file a petition for reconsideration. N.D.C.C. § 28–32–40(1). Any party to "any proceeding heard by an administrative agency, except when the order of the administrative agency is declared final by any other statute, may appeal from the order" to the district court. N.D.C.C. § 28–32–42(1). The agency maintains and certifies the official record of each adjudicative proceeding, or other administrative proceeding heard by it, *see* N.D.C.C. § 28–32–44, and a district court reviews the agency's determination based only on the record filed with the court and under the deferential standards outlined in N.D.C.C. § 28–32–46. This Court reviews a district court review of an agency decision under those same deferential standards, *see* N.D.C.C. § 28–32–49, and we review the agency's decision and record compiled before the agency while giving respect to sound reasoning of the district court. *Gross v. North Dakota Dep't of Human Servs.*, 2004 ND 24, ¶ 6, 673 N.W.2d 910.

[¶ 16] Section 28–32–46, N.D.C.C., requires this Court to affirm an administrative agency decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 17] The provisions for adjudicative proceedings in N.D.C.C. ch. 28–32 generally provide for evidentiary hearings with the right to cross-examine witnesses and require the agency to make appropriate findings of fact, conclusions of law, and to issue an order, which is subject to appeal. However, as relevant to this case, N.D.C.C. ch. 23–01 specifically pertains to the duties of the Health Department, and N.D.C.C. § 23–01–23 provides:

A permit hearing conducted for purposes of receiving public comment or an investigatory hearing conducted under chapters 23–20.1, 23–20.3, 23–25, 23–29, 61–28, and 61–28.1 is not an adjudicative proceeding under chapter 28–32 and is not subject to the requirements of chapter 54–57.

[¶ 18] In construing the statutes pertaining to the Health Department's hearings on applications for NDPDES permits, our duty is to ascertain the intent of the legislature. *See Stewart v. Ryan*, 520 N.W.2d 39, 45 (N.D.1994). We initially seek to ascertain the legislature's intent from the language of the statute, and words in the statutes must be given their plain, ordinary, and commonly understood meanings. *Id.* Statutory provisions must be considered as a whole with each provision harmonized, if possible. *Id.* In interpreting statutory provisions, every effort must be made to give each word, phrase, clause, and sentence meaning and effect because the law neither does nor requires idle acts. *Id.; County of Stutsman v. State Historical Soc'y*, 371 N.W.2d 321, 325 (N.D.1985). A specific statute controls over a general statute. *Diocese of*

*Bismarck Trust v. Ramada, Inc.*, 553 N.W.2d 760, 766 (N.D.1996).

[¶ 19] Section 23–01–23, N.D.C.C., was enacted in 1995 to specifically preclude application of the "contested case" procedural requirements of the Administrative Agencies Practice Act to environmental permit hearings conducted for the purpose of receiving public comment, because the potential cost requirements for contested case procedures for those type of permit hearings would be "astronomical." *See Hearing on Senate Bill 2154 before Senate Judiciary Committee*, 54th N.D. Legis. Sess. (Jan. 11, 1995) (testimony of William J. Delmore, Assistant Attorney General for Environmental Section of Health Department). The language and legislative history of N.D.C.C. § 23–01–23 indicates a "permit hearing conducted for purposes of receiving public comment .... conducted under ... [N.D.C.C. ch.] 61–28 ... is not an adjudicative proceeding under [N.D.C.C. ch.] 28–32." Under the specific language of N.D.C.C. § 23–01–23, the general procedural requirements for an adjudicative proceeding in N.D.C.C. ch. 28–32 do not apply to a "permit hearing conducted for purposes of receiving public comment" under N.D.C.C. ch. 61–28.

[¶ 20] Here, the Health Department's public notice of intent to issue a NDPDES permit stated there would be "two public hearings to solicit comments prior to finalizing permit conditions under authority" of N.D.C.C. § 61–28–04. Those hearings were conducted according to the Health Department's procedures for hearings on permits. *See N.D. Admin. Code* ch. 33–16–01. After the permit was issued, several parties who had opposed the permit filed petitions for reconsideration, citing N.D.C.C. § 28–32–40. One of the parties requested "a hearing on this matter" in the context of its petition to reconsider, but in any event the record does not

reflect that any party sought an adjudicative proceeding under N.D.C.C. ch. 28–32. *See* N.D.C.C. § 61–28–07. On this record, we need not decide the full range of the administrative procedures that may have been available to Manitoba, and we reject Manitoba's claim the Health Department failed to conduct the permitting process in accordance with the law.

[¶ 21] Because the hearing for the purpose of receiving public comment was not an adjudicative proceeding, the Health Department was not required to issue findings of fact and conclusions of law under N.D.C.C. § 28–32–39. Nevertheless, the person conducting the hearings for public comment did issue some recommended findings and conclusions and a recommended decision to issue the permit, and the Health Department adopted that recommendation to issue the Water Commission a NDPDES permit.

[¶ 22] Any party to "any proceeding heard by an administrative agency" may appeal from the agency order under N.D.C.C. § 28–32–42, and judicial review of appeals from the agency determination is generally governed by the deferential standards in N.D.C.C. §§ 28–32–46 and 28–32–49. Those deferential standards of review for an agency's findings of fact, conclusions of law, and decision are anchored in the separation of powers doctrine. *See Wagner v. Sheridan County Soc. Servs. Bd.*, 518 N.W.2d 724, 729 (N.D. 1994) (citing *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979)). However, the deferential standard of review for findings of fact in N.D.C.C. § 28–32–46 is not completely compatible with administrative determinations where there has been no adjudicative proceeding and preparation of findings of fact. Nevertheless, those deferential standards of review generally comport with judicial review of non-judicial decision-making, which is limited to wheth-

er a decision is arbitrary, capricious, or unreasonable. *See Little v. Traynor*, 1997 ND 128, ¶ 17, 565 N.W.2d 766 (citing *City of Fargo v. Ness*, 529 N.W.2d 572, 576 (N.D.1995); *Burleigh County Water Res. Dist. v. Burleigh County*, 510 N.W.2d 624, 627 (N.D.1994); and *Shaw v. Burleigh County*, 286 N.W.2d 792, 797 (N.D.1979)). In *Little*, at ¶¶ 12–17, we applied the arbitrary, capricious, or unreasonable standard in the predecessor to N.D.C.C. § 28–32–47(4) to review an agency's quasi-legislative rule-making function in which there was not an adjudicative proceeding with a corresponding record, and we said the record was adequate for our review if it enabled us to discern the rationale for the agency's decision.

[¶ 23] In *Koch Hydrocarbon Co. v. State*, 454 N.W.2d 508, 510–11 (N.D.1990), we considered the standard of review of a tax assessment decision by the State Board of Equalization, which had been excluded from the definition of an administrative agency in 1981 after our decision in *Soo Line R.R. Co. v. State*, 286 N.W.2d 459 (N.D.1979). We said the rationale for the limited scope of judicial review of non-judicial decision making was the separation of powers doctrine, and we held the appropriate scope of review of the Board's assessment was whether it was arbitrary, capricious, or unreasonable. *Koch*, at 511.

[¶ 24] The principles underlying the separation of powers doctrine are especially applicable to the Health Department's decision to issue a NDPDES permit, because there was not an adjudicative proceeding and the general standard of review of agency's findings for adjudicative proceedings under N.D.C.C. ch. 28–32 is incompatible with the procedural posture of this case. Considering the type of record in this proceeding, the Health Department's decision is entitled to even greater deference than a proceeding after an adju-

dicative proceeding, and we review the Health Department's permitting decision to determine whether it is arbitrary, capricious, or unreasonable. *See Little*, 1997 ND 128, ¶ 17, 565 N.W.2d 766; *Koch*, 454 N.W.2d at 511. *See also Graber v. Logan County Water Res. Bd.*, 1999 ND 168, ¶ 7, 598 N.W.2d 846; *Pic v. City of Grafton*, 1998 ND 202, ¶¶ 6, 8, 586 N.W.2d 159; *Anderson v. Richland County Water Res. Bd.*, 506 N.W.2d 362, 367 (N.D.1993). *See generally* 5 Stein, Mitchell, Mezines, *Administrative Law* § 43.02[6](2004) (stating arbitrary and capricious standard is more restrictive than substantive evidence standard because under arbitrary and capricious standard court must uphold agency if there is any rational basis for decision). That deferential standard is particularly applicable where, as here, the subject matter is complex or technical and involves agency expertise. *See Kraft v. North Dakota State Bd. of Nursing*, 2001 ND 131, ¶ 10, 631 N.W.2d 572. A decision is arbitrary, capricious, or unreasonable if it is not the product of a rational mental process by which the facts and the law relied upon are considered together for the purpose of achieving a reasoned and reasonable interpretation. *See Little*, at ¶ 17, 565 N.W.2d 766; *Graber*, at ¶ 7, 598 N.W.2d 846. We consider the issues raised in Manitoba's appeal in light of that highly deferential standard of review.

### III

### A

[¶ 25] Manitoba argues the Health Department's decision to issue a permit for the state outlet failed to adequately consider increased phosphorus loading in downstream waters. Manitoba argues the Health Department failed to determine how the discharge of Devils Lake water into the Sheyenne River would contribute to existing and projected chronic violations of North Dakota's numeric phosphorus water quality standard of .1 million per liter of water. *See. N.D. Admin. Code* § 33–16–02.1–09(3) and Table 1. Manitoba argues the state outlet project's discharge of phosphorus-rich Devils Lake water into the Sheyenne River will necessarily contribute to violations of the Sheyenne River's phosphorus standard. The Health Department responds the phosphorus guidelines are not strict standards, but, under its rules, are "intended as interim guideline limits. Since each stream or lake has unique characteristics which determine the levels of these constituents that will cause excessive plant growth (eutrophication), the department reserves the right to review these standards after additional study and to set specific limitations on any waters of the state." N.D. Admin. Code § 33–16–02.1–09, Table 1, fn. 1. The Health Department argues phosphorus loading from the state outlet will not effect beneficial uses or have adverse consequences to the downstream waters, because the increased phosphorus load will not contribute to eutrophication in Lake Ashtabula or the Sheyenne River due to the limited amount of available nitrogen, which is also necessary for plant growth.

[¶ 26] The Health Department's interpretation of its regulations and the phosphorus guideline as a flexible standard is entitled to deference, especially when, as here, the subject matter is complex or technical. *See St. Benedict's Health Center v. North Dakota Dep't. of Human Servs.*, 2004 ND 63, ¶ 9, 677 N.W.2d 202. Moreover, there is evidence in this record that additional phosphorous loading may be a problem when it contributes to eutrophication, which is a condition in an aquatic ecosystem where high nutrient concentrations such as phosphorus and nitrogen stimulate blooms of algae. There is evi-

dence in this record that due to the limiting effect of the absence of nitrogen in the downstream waters, the addition of phosphorus to those waters will not result in a commensurate increase in algae and will not affect beneficial uses for those waters. The phosphorus issue was part of the environmental impact statement prepared by the Corps of Engineers for the proposed federal project. According to the Corps of Engineers, phosphorus loading was not an impediment to the federal project, which had a greater proposed discharge rate than the state outlet. The record also reflects the Health Department considered the increased phosphorous load in response to comments submitted to it and stated:

the annual phosphorus load will increase; however, its impact on the Sheyenne River and Lake Ashtabula will likely be minimal. Primary productivity is largely controlled by a limiting substance which, in this situation, is likely to be nitrogen. Therefore, any increase in available nitrogen will increase algal growth, whereas an increase of phosphorus will not. Because Lake Ashtabula will trap a significant portion of the phosphorus, downstream reaches of the Sheyenne River should experience nearly base conditions. Phosphorus concentrations in the Red River will be near base conditions, and therefore, no changes in trophic condition or response are expected.

[¶ 27] We have reviewed the administrative record about the phosphorous level in the downstream waters, and we conclude there is evidence in the record which supports the Health Department's determination. The record reflects the Health Department adequately addressed the phosphorous issue, and its decision on this issue is not arbitrary, capricious, or unreasonable.

B

[¶ 28] Manitoba argues the permit violated North Dakota's anti-degradation regulations in N.D. Admin. Code § 33–16–02.1–02(2). Manitoba argues the outlet will result in significant degradation of the receiving waters, and the Health Department failed to take several specified steps in accordance with its anti-degradation review process. Manitoba argues the Health Department did not affirmatively demonstrate that degradation was necessary to accommodate important social or economic development, the Health Department did not adequately assess whether any reasonable non-degrading or less degrading alternatives were available, and the Health Department granted the permit even though the discharge would contribute additional compliance problems involving phosphorous in the zone of influence of the proposed discharge.

[¶ 29] The record includes what the parties recognize as the Health Department's anti-degradation procedure. *See* N.D. Admin. Code ch. 33–16–02.1. Under that procedure, the Sheyenne River, Red River, and Lake Ashtabula are category 1 waters, and the Health Department must conduct an anti-degradation review for NDPDES permit applications for discharges into category 1 waters unless the source of the discharge would have no significant permanent effect on the quality and beneficial use of the downstream waters. Under the Department's anti-degradation procedures for category 1 waters, proposed activities that lower the ambient quality in a water body of any parameter by more than fifteen percent, reduce the available assimilative capacity by more than fifteen percent, or increase permitted pollutant loadings by more than fifteen percent are deemed to have significant effects. Proposed activities that have no significant effect on water quality or bene-

ficial uses are eliminated from further anti-degradation review. Under the Health Department's procedures, the primary purpose of category 1 review is to determine if reasonable non-degrading or less-degrading alternatives are available, and an applicant must also show that a discharge will be of economic or social importance in the area.

[¶ 30] The Health Department determined phosphorus was not a parameter of concern for anti-degradation review because the addition of phosphorus to downstream waters would not alter the beneficial use of those waters. There is evidence in this record that phosphorous was not a parameter of concern for anti-degradation review because any additional phosphorous would not alter the beneficial use of the downstream waters. We conclude the Health Department's determination that phosphorus was not a parameter of concern for anti-degradation review is not arbitrary, capricious, or unreasonable.

[¶ 31] Manitoba also argues the Health Department failed affirmatively to demonstrate the state outlet was necessary for social or economic development and the Health Department did not adequately assess whether any reasonable non-degrading or less degrading alternatives were available. There is evidence in the record that the Health Department considered non-degrading or less degrading alternatives, including water management alternatives in the Devils Lake basin, water treatment alternatives, and alternative discharge locations. Although Manitoba and the amici curiae dispute the Health Department's analysis of those alternatives, on this record, we conclude the Health Department adequately considered other non-degrading or less degrading alternatives.

[¶ 32] The record also includes information that the flooding on Devils Lake has forced roads to be raised, dikes to be constructed and homes and towns to be relocated at an estimated cost of nearly four hundred million dollars since 1993. The Corps of Engineers' environmental impact statement indicates that millions of dollars in costs have been incurred by businesses and the general public because of detours from permanent and temporary road closures and constant construction in response to the rising lake. There is evidence that the rising waters have impacted insurance rates, forced costly flood prevention measures for property owners, and threatened sewer lines, electrical utilities, and water supplies. The information submitted by the Water Commission and included in the Corps of Engineers' report demonstrates that the state project is part of a multi-pronged flood control effort designed to accommodate social and economic factors in the affected regions. On this record, we conclude the Health Department adequately considered those anti-degradation issues, and its determination the outlet will not violate North Dakota's anti-degradation rules is not arbitrary, capricious, or unreasonable.

C

[¶ 33] Manitoba argues the permit fails to incorporate required measures to minimize the risks of biota transfer. Manitoba argues two fish parasites, gyrodactylus hoffmani and ligula intestinalis, are found in Devils Lake, but are not present in the Sheyenne River and the Red River. Manitoba argues the permit fails to incorporate appropriate technology-based control measures, including a sand filter, to minimize the risk the state outlet will transfer alien and invasive species of biota from Devils Lake to the Sheyenne and the Red River watersheds. Manitoba argues the Health Department's

decision not to require a sand filter is not supported by the evidence.

[¶ 34] As part of its environmental impact statement, the Corps of Engineers conducted a biota transfer risk assessment to evaluate the potential for an outlet to transfer biota from Devils Lake to downstream waters. The Corps of Engineers' study examined fish, fish parasites, and pathogens, algae communities, vascular plants, protozoa, and invertebrates. The study assembled a list of probable biota of concern that could directly or indirectly cause environmental and economic damage to downstream waters. The study indicated that a large majority of probable biota of concern were ultimately classified as non-biota for risk assessment because they were found to be widespread and able to disburse readily among water bodies. The study explained that Devils Lake biota can be transferred across the basin boundary by existing natural disbursal vectors such as wind and vertebrae animals, and by anthropogenic means, including recreational boats and trailers, bait fish transfer, and an active fish stocking program that has affected reciprocal transfers among many waters in the state. The study recognized those natural pathways have been an effective means of biota transfer, and it was unlikely that transfers of biota would involve first-time introductions.

[¶ 35] There was conflicting evidence about whether two parasites found in Devils Lake, gyrodactylus hoffmani and ligula intestinalis, were also present in downstream waters. There is some evidence that the two parasites were present in Devils Lake and were not present in downstream waters. A consultant for the Corps of Engineers explained that concerns over the two parasites were unwarranted. The consultant indicated ligula intestinalis was a parasite that was not host-specific and was widely dispersed by birds. The consultant indicated some experts have confirmed the presence of ligula intestinalis in much of the Hudson Bay's drainage area and have indicated that it was highly unlikely that the species was confined only to Devils Lake. The consultant also indicated the gyrodactylus hoffmani is a parasite of a fish species commonly used as prey by game fish, but there was evidence of its presence in Minnesota, including the waters in the Red River basin.

[¶ 36] The Corps of Engineers also conducted a full-risk analysis of two species, the striped bass and Eurasian watermilfoil. The Corps of Engineers explained there was only a small possibility that the striped bass posed a risk to downstream waters and Eurasian watermilfoil was not known to occur in Devils Lake but was found in the Sheyenne River below Lake Ashtabula. The striped bass previously had been stocked in Devils Lake, but its continued presence in Devils Lake was doubtful, and the Corps explained there was only a small possibility that the fish posed a risk to downstream waters. The Health Department nevertheless required a mesh screen on the intake structure for the state outlet to minimize the risk of transferring adult striped bass into downstream waters.

[¶ 37] The Health Department found that although there was "a concern that an outlet may result in an undesirable transfer of biota from Devils Lake to the Sheyenne River, no specific biota of concern was identified. Surveys and studies completed by the State Water Commission and Game and Fish Department indicate that Devils Lake is within the Hudson Bay watershed and has historically been connected to that watershed." There is some evidence in this record that Devils Lake is connected to downstream waters through natural pathways and shares the same biota with the downstream waters. The rec-

ord further reflects the risk of transfer of biota is very low. There have been studies and literature reviews that have examined the potential for biota transfer associated with the movement of water from Devils Lake into the downstream waters. Although those studies may not be as conclusive as Manitoba or the amici curiae would like, those studies do not show that the state outlet would result in a significant risk of harm in the transfer of alien and invasive species of biota from Devils Lake to the downstream waters. There is evidence in this record which was available to the Health Department and which supports its determinations regarding the risk of biota transfer. We conclude the Health Department's determinations regarding the risk of biota transfer are not arbitrary, capricious, or unreasonable.

### IV

[¶ 38] Under our deferential standard of review, we conclude there is evidence in this record which supports the Health Department's decision to issue the Water Commission a permit for the state outlet under the conditions stated in the permit. We decline Manitoba's invitation to reweigh the evidence. Rather, under our deferential standard of review, we conclude the Health Department's decision to issue the permit is not arbitrary, capricious, or unreasonable.

### V

[¶ 39] We affirm the district court judgment affirming the Health Department's decision to issue the Water Commission a permit for the state outlet.

[¶ 40] DALE V. SANDSTROM, CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.