2008 ND 34

**PEOPLE TO SAVE the SHEYENNE RIVER, INC., the Peterson Coulee Outlet Association, the National Wildlife Federation and the Government of the Province of Manitoba, Appellants**

v.

**NORTH DAKOTA DEPARTMENT OF HEALTH, and North Dakota State Water Commission, Appellees.**

No. 20070118.

Supreme Court of North Dakota.

Feb. 21, 2008.

See also 697 N.W.2d 319.

William J. Delmore (argued) and Daniel Nagle (on brief), Kelsch, Kelsch, Ruff &

Kranda, Mandan, N.D., and Daniel E. Buchanan (on brief), Jamestown, N.D., for appellant People to Save the Sheyenne River, Inc.

Joseph J. Cichy, P.C. (on brief), Bismarck, N.D., for appellant Peterson Coulee Outlet Association.

James Murphy (on brief), Montpelier, VT, for appellant National Wildlife Federation.

Richard A. Wegman (appeared) and Eldon V.C. Greenberg (appeared), Garvey Schubert Barer, Washington, D.C., for appellant the Government of the Province of Manitoba.

Dean J. Haas (argued), Assistant Attorney General and Lyle G. Witham (appeared), Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for appellee North Dakota Department of Health.

Matthew Arnold Sagsveen (argued), Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for appellee North Dakota State Water Commission.

CROTHERS, Justice.

[¶ 1] Opponents to the modification of a permit for the Devils Lake outlet (collectively "Manitoba") appeal from a district court judgment affirming a decision by the North Dakota Department of Health to modify the permit. Manitoba claims the Health Department failed to conduct a required antidegradation review before modifying the permit and there was not "cause" to support the modification. We conclude the Health Department did not act arbitrarily, capriciously, or unreasonably in deciding an antidegradation review was not required to modify the permit and there was cause to modify a sulfate limitation in the initial permit. We also conclude, however, the Health Department acted arbitrarily, capriciously, and unreasonably in deciding there was cause to modify the method for measuring total suspended solids ("TSS") and the period of operation for the permit. We affirm in part, reverse in part, and remand with instructions to remove the modifications for TSS and the period of operation for the permit.

I

[¶ 2] As part of an approach to provide relief from flooding by Devils Lake, the Health Department granted the North Dakota State Water Commission a North Dakota Pollutant Discharge Elimination System ("NDPDES") permit in August 2003, to construct and operate an outlet to discharge water from the West Bay of Devils Lake into the Sheyenne River. Devils Lake is about fifteen miles from the Sheyenne River, which is a tributary to the Red River. The Sheyenne River generally flows in a southeasterly direction and forms Lake Ashtabula at the Bald Hill Dam, which is about 270 river miles upstream from the Sheyenne River's confluence with the Red River. The Red River forms the boundary between North Dakota and Minnesota and flows north across the Canadian border into Lake Winnipeg in Manitoba, which in turn drains into Hudson Bay. The NDPDES permit expires at midnight on June 30, 2008, and includes ongoing requirements for monitoring water quality.

[¶ 3] In *People to Save the Sheyenne River, Inc. v. North Dakota Dep't of Health*, 2005 ND 104, 697 N.W.2d 319, we described additional factual background and circumstances leading up to the issuance of the initial permit, and in June 2005, we affirmed the Health Department's decision to issue the permit. The Water Commission began operating the outlet in August 2005, with a discharge point into the Sheyenne River between an

upstream monitoring gauge at Flora and a downstream monitoring gauge at Bremen. The initial permit allowed the Water Commission to operate the outlet "only during the open-water season, the months May through November" as long as the discharge of water into the Sheyenne River did not cause the sulfate concentration at Bremen to exceed 300 milligrams per liter, or TSS to exceed 100 milligrams per liter.

[¶ 4] In 2005, the Water Commission only operated the outlet in August, primarily because sulfate levels at Bremen exceeded the 300 milligrams per liter limitation. The Water Commission investigated the high sulfate levels in the Sheyenne River, and the Commission determined the natural background sulfate levels varied considerably and often exceeded the water quality standard of 450 milligrams per liter for category 1 waters like the Sheyenne River and the 300 milligrams per liter required by the initial permit.

[¶ 5] In May 2006, the Water Commission asked the Health Department to modify three conditions of the permit: (1) to raise the sulfate limit at Bremen from 300 milligrams per liter to 450 milligrams per liter, which is the standard for the Sheyenne River, or alternatively, to allow the operation of the outlet to increase the sulfate level by 15 percent above the 300 milligrams per liter limit up to a maximum of 450 milligrams per liter; (2) to change the operating period of the outlet "to the ice free portion of the year to allow operation of the outlet earlier in the year if the ice is off the lake and river and flooding is not a concern"; and (3) to remove or revise the 100 milligrams per liter limit for TSS, because "[o]perational controls do not allow for detecting and responding to TSS fluctuations that may occur prior to realizing a limit exceedance as the TSS is determined by lab test rather than real time monitoring."

[¶ 6] After notice and a public hearing in June 2006, and an opportunity for written comments with responses, the Health Department modified the permit, effective August 17, 2006, incorporating the Water Commission's request. The Health Department adopted the chief of the Environmental Health Section's recommended findings and conclusions, which provided:

"2.0 The North Dakota Department of Health made the determination to modify the NDPDES permit based on receipt of new information. The specific conductance measurements at the Flora and Bremen gages were established during 2005. Prior to 2005, there were limited data available at the point of insertion. In the process of developing a relationship between specific conductance and sulfate concentration, it was recognized that the natural background levels for sulfate at the point of insertion were higher and more variable than known previously.

3.0 The water quality standard of 450 milligrams per liter (mg/L) in the Sheyenne River and 250 mg/L in the Red River of the North will not be exceeded as a result of the proposed permit modification.

4.0 The permit modification allows for a 15 percent increase above base conditions of sulfate in the Sheyenne River, not to exceed 450 mg/L. For example, if the sulfate concentration in the Sheyenne River upstream of the outlet were 300 mg/L, the maximum increase allowed would only be 45 mg/L above background. The natural background concentration near the point of discharge into the Sheyenne River periodically exceeds the numeric criterion for sulfate.

5.0 Antidegradation review was not required because beneficial use of the waters is not affected by the permit modification. The permit modification will not cause the concentration of any parameter of concern, including sulfate, to be exceeded by more than 15 percent.

6.0 Extending the discharge time frame will have no significant, permanent effect on the quality and beneficial uses of the water because the permit does not allow discharge under ice conditions.

7.0 There presently are no total suspended solids (TSS) stream standards for any classes of waters in North Dakota. The control of TSS in the outlet discharge is achieved primarily through proper design, operation and maintenance. As part of operation and maintenance, the permitee will be required to implement best management practices (BMPs) to control TSS and to continue sampling for TSS at the outlet structure. BMP requirements are more appropriate than numeric limits for controlling TSS in this discharge."

The district court affirmed the Health Department's decision to modify the permit.

II

[¶ 7] In *People to Save the Sheyenne,* 2005 ND 104, ¶¶ 9–11, 697 N.W.2d 319, we summarized the basic framework for issuance of a NDPDES permit:

"[T]he Clean Water Act, 33 U.S.C. § 1251 *et seq.,* prohibits the discharge of any pollutant from a point source to surface waters except when the discharge complies with a National Pollutant Discharge Elimination System permit. *See* 33 U.S.C. §§ 1311(a) and 1342. The United States Environmental Pro-tection Agency has delegated authority to the Health Department to issue NDPDES permits as part of the Clean Water Act. *See* 33 U.S.C. § 1342(b). In issuing a permit, the Health Department must comply with federal law. *See* 33 U.S.C. § 1342(b).

"The Health Department issues NDPDES permits under the authority granted in N.D.C.C. ch. 61–28, which relates to the control, prevention, and pollution abatement of surface waters. Section 61–28–04, N.D.C.C., designates the Health Department as the state water pollution control agency and authorizes the Health Department to make rules governing the issuance, denial, modification, or revocation of permits and to hold hearings necessary for the proper administration of N.D.C.C. ch. 61–28. Section 61–28–06, N.D.C.C., prohibits the construction of an outlet for the discharge of any wastes into the waters of this state without a valid permit.

"Under the authority in N.D.C.C. ch. 61–28, the Health Department has promulgated N.D. Admin. Code ch. 33–16–01, which establishes procedures for the application for, and the issuance, denial, and modification of NDPDES permits. N.D. Admin. Code § 33–16–01–01(2). Those provisions require notice and public participation for tentative determinations and draft permits, a period for public comment, a requirement for responses to comments, the preparation of fact sheets for applications, notice to appropriate government agencies, and public hearings for applications involving significant public interest. *See* N.D. Admin. Code §§ 33–16–01–06, 33–16–01–07, 33–16–01–07.1, 33–16–01–08, 33–16–01–09, 33–16–01–10, and 33–16–01–11."

[¶ 8] Proceedings for modification of a NDPDES permit are governed by the pro-

cedures in N.D.C.C. § 61–28–07, which incorporates the procedures of N.D.C.C. ch. 28–32. *See* N.D. Admin. Code § 33–16–01–25(3). *See also People to Save the Sheyenne*, 2005 ND 104, ¶¶ 12–24, 697 N.W.2d 319. However, under N.D.C.C. § 23–01–23, a permit hearing is not an adjudicative proceeding. *People to Save the Sheyenne*, at ¶¶ 17–19.

■ [¶ 9] Here, the Health Department granted the permit modification after a public hearing and without an adjudicatory proceeding. In a similar procedural posture, we relied heavily on the separation of powers doctrine and reviewed the Health Department's initial decision to grant the NDPDES permit under an arbitrary, capricious, and unreasonable standard. *People to Save the Sheyenne River*, 2005 ND 104, ¶ 24, 697 N.W.2d 319. We explained the arbitrary, capricious, and unreasonable standard was a highly deferential standard of review that was particularly applicable for complex or technical matters involving agency expertise. *Id.* We said, "[a] decision is arbitrary, capricious, or unreasonable if it is not the product of a rational mental process by which the facts and the law relied upon are considered together for the purpose of achieving a reasoned and reasonable interpretation." *Id.* We also recognized the Health Department was not required to issue findings of fact and conclusions of law for an initial permit decision, but we said the record must be sufficient to understand the reason for the Department's decision. *Id.* at ¶¶ 21–22. This appeal comes to us in a similar procedural posture after a public hearing, and we review the Health Department's decision to modify the permit under the same arbitrary, capricious, and unreasonable standard.

III

■ [¶ 10] Manitoba argues that, in modifying the sulfate limitation in the initial permit, the Health Department failed to conduct a required antidegradation review under N.D. Admin.Code ch. 33–16–02.1 (Appendix IV).

[¶ 11] Appendix IV outlines North Dakota's antidegradation procedure and delineates the Health Department's process for implementing antidegradation policy. N.D. Admin. Code ch. 33–16–02.1 (Appendix IV). Under that procedure, all waters in North Dakota receive one of three different levels of antidegradation protection, and antidegradation requirements are necessary whenever a proposed regulated activity, including a NDPDES permit, "may have some effect on water quality." *Id.* Under the Health Department's antidegradation requirements for category 1 waters like the Sheyenne and Red Rivers and Lake Ashtabula, regulated activities resulting in a new or expanded source of pollutants are subject to antidegradation review "unless the source would have no significant permanent effect on the quality and beneficial uses of those waters, or if the effects will be appropriately minimized and temporary." *Id.* *See also People to Save the Sheyenne*, 2005 ND 104, ¶ 29, 697 N.W.2d 319. "The department will identify and eliminate from further review those proposed activities that will have no significant effect on water quality or beneficial uses." N.D. Admin.Code ch. 33–16–02.1 (Appendix IV). Under those regulations, "significant effects" are deemed to be "[p]roposed activities that would lower the ambient quality in a water body of any parameter by more than 15 percent, reduce the available assimilative capacity by more than 15 percent, or increase permitted pollutant loadings to a water body by more than 15 percent." *Id.* Proposed activities having no significant effect on

water quality or beneficial uses are eliminated from further antidegradation review. *Id. See People to Save the Sheyenne*, at ¶ 29.

[¶ 12] In *People to Save the Sheyenne*, 2005 ND 104, ¶ 28, 697 N.W.2d 319, those opposing the initial permit argued that the permit would result in significant degradation of the receiving waters, including additional phosphorus in the proposed discharge area, and that the Health Department failed to follow its antidegradation review process. This Court concluded the Health Department's decision that phosphorus was not a parameter of concern for antidegradation review was not arbitrary, capricious, or unreasonable based on record evidence that phosphorous was not a parameter of concern for antidegradation review and because any additional phosphorus would not alter the beneficial use of the downstream waters. *Id.* at ¶ 30. We also concluded the Health Department adequately considered social economic issues regarding antidegradation, and the Health Department's decision that the outlet would not violate antidegradation rules was not arbitrary, capricious, or unreasonable. *Id.* at ¶ 32.

[¶ 13] Manitoba argues that under the terms of the modified permit, the total annual pollutant loadings of sulfates into the Sheyenne River were increased by more than 15 percent through the combined effect of the increased sulfate limitation and the extension of the operating period for the permit. Manitoba contends that allowing an increase in sulfate concentration above the baseline rate for the Sheyenne River by 15 percent, up to a maximum of 450 milligrams per liter, combined with allowing discharge to occur outside the May 1 through November 30 time period, necessarily means the total annual pollutant load will increase by more than 15 percent above what would have oc-

curred under the limit of 300 milligrams per liter in the initial permit. Manitoba claims the threshold for a "significant effect" was met by the modification, the Health Department's failure to conduct an antidegradation review was unlawful, and the permit modification cannot be allowed to stand. The Health Department responds that modification of the sulfate limit does not violate antidegradation rules because the modification will not impact the quality and beneficial use of the state's waters and will not lower the ambient water quality by more than 15 percent for any parameter.

[¶ 14] The Health Department found antidegradation review was not required because the beneficial use of the waters was not affected by the modification and the modification would not cause the concentration of any parameter of concern, including sulfate, to be exceeded by more than 15 percent; because the water quality standard for the Sheyenne River and the Red River would not be exceeded as a result of the modification; and because the modification allows for a 15 percent increase above base conditions for sulfate in the Sheyenne River, which periodically exceeds the numeric criterion for sulfate near the discharge point. In response to a submitted comment that it had failed to undertake an antidegradation review, the Health Department explained:

"Because beneficial use is not affected, the antidegradation review is not required. . . .

"Because it is targeted at natural background concentrations, the ambient quality will not exceed 15 percent. The assimilative capacity applies to nonconservative constituents. Sulfate is a conservative constituent or is assimilated at a very low rate and not considered for these purposes. The additional sulfate

at these levels does not affect the assimilative capacity of the stream.

"The application of mass loading criteria to this stream is inappropriate. Mass loading criteria are applied to water bodies such as lakes or reservoirs that have a hydraulic residence time. The sulfate standard is intended to protect drinking water uses. Drinking water supply systems respond to concentration considerations, not mass loading. As such, it is appropriate to evaluate sulfate additions to water bodies with an established drinking water use in terms of concentration. The department issues to municipalities and industries discharge permits which are based on concentration of constituents in the discharge and the stream."

[¶ 15] This record contains evidence that the sulfate level in the Sheyenne River varies considerably and was often above the 300 milligrams per liter limit in the initial permit. The Health Department specifically found the trigger for the antidegradation review was not met and the limits for the modified permit would not be greater than 15 percent for any parameter of concern, including sulfate. Sulfate limits involve a technical area in which the Health Department's decision is entitled to deference. *See People to Save the Sheyenne*, 2005 ND 104, ¶ 24, 697 N.W.2d 319. Moreover, the Health Department's decision not to apply mass loading criteria to the Sheyenne River is authorized by its interpretation of the antidegradation procedure. *See* N.D. Admin.Code ch. 33–16–02.1 (Appendix IV) ("the characteristics of the receiving water body (e.g., lake versus river, etc.)" is relevant in regulating a parameter of concern). An administrative agency's reasonable interpretation of a regulation is entitled to deference. *St. Benedict's Health Ctr. v. North Dakota Dep't of Human Serv.*, 2004

ND 63, ¶ 9, 677 N.W.2d 202. "An agency has a reasonable range of discretion to . . . apply its own regulations, and the agency's expertise is entitled to deference when the subject matter is complex." *Id.*

[¶ 16] The Health Department's decision about sulfate limitations and mass loading under its antidegradation regulations involves a complex subject and is entitled to deference. We reject Manitoba's claim that this issue "involves the straightforward application of regulatory standards, where the facts in the record demonstrate that the regulatory standards have not been met." Rather, we conclude the Health Department's findings reflect the application of the factual circumstances of this case to those regulations in a complex and technical area, which resulted in a factual determination that the requirements for an antidegradation review had not been triggered. We conclude the Health Department's decision that an antidegradation review was not required is not arbitrary, capricious, or unreasonable.

IV

[¶ 17] Manitoba argues the permit modifications failed to meet the "cause" requirement in the Health Department's regulations.

[¶ 18] The Health Department may modify a permit for cause. N.D. Admin. Code § 33–16–01–25(2). The causes set forth in 40 C.F.R. § 122.62(a), are explicitly incorporated into North Dakota's regulations and, as relevant to this case, define cause for a modification to include new information or to correct technical mistakes:

"(a) Causes for modification. The following are causes for modification. . . .

"(2) Information. The Director has received new information. Permits may be modified during their terms for this cause only if the information was not

available at the time of permit issuance (other than revised regulations, guidance, or test methods) and would have justified the application of different permit conditions at the time of issuance. For NPDES general permits (§ 122.28) this cause includes any information indicating that cumulative effects on the environment are unacceptable. For new source or new discharger NPDES permits (§§ 122.21, 122.29), this cause shall include any significant information derived from effluent testing required under § 122.21(k)(5)(vi) or § 122.21(h)(4)(iii) after issuance of the permit.

. . . .

"(15) To correct technical mistakes, such as errors in calculation, or mistaken interpretations of law made in determining permit conditions."

### A

[¶ 19] Manitoba argues the Health Department's modification of the sulfate limitation is unjustified because the base lines for sulfate levels in the Sheyenne River were, or should have been, clearly known when the Health Department issued the original permit and the data obtained after the permit was issued only confirmed those trends. Manitoba thus claims the information about the base line trends for sulfate in the Sheyenne River was not "new information."

[¶ 20] Manitoba's argument involves evidence about the sulfate readings at two checkpoints on the Sheyenne River, the upstream Flora gauge and the downstream Bremen gauge. There is evidence those gauges were not operating when the original permit was issued, and sulfate levels instead were recorded at gauges in Harvey and in Warwick. There is also evidence that after the outlet began operating in August 2005, sulfate readings at the Bremen gauge indicated the sulfate level was above the limitations imposed by the initial permit. After a study by the Water Commission, it reported the natural sulfate levels in the Sheyenne River near the outlet were often higher than the limitations imposed in the initial permit. According to the Water Commission, the "operating restrictions in the [initial] NDPDES permit and the modeling conducted for the permit were based upon the historic water quality record at Warwick through 1999," and it had been incorrectly assumed the Sheyenne River had relatively similar sulfate concentrations along its entire course.

[¶ 21] A fact sheet prepared by the Health Department explained that "[r]ecent monitoring shows increasing trends in the background sulfate levels in the upper Sheyenne" and concluded:

"Based on the recent data, sulfate concentrations in the Sheyenne River at the outlet appear to be naturally occurring and higher than those at Warwick. Influx of fresh groundwater between the outlet and the Warwick gage dilutes the higher sulfate concentrations upstream and limits their downstream effects.

"There is substantial evidence that natural and historical sulfate concentrations at the Flora and Bremen gages are significantly higher than those at Warwick. As a result, the natural freshening of the river between Bremen and Warwick is substantial enough that greater sulfate concentrations at Bremen could be sustained without causing concentrations significantly above 300 mg/l at Warwick.

"Based on available information, the Department of Health proposes to modify the instream sulfate limit. Any discharge from this project will still be managed so as not to exceed the 300 mg/l sulfate limit when natural background sulfate concentrations in the riv-

er are less than 260 mg/l. When the ambient concentration of sulfate in the river is equal to or greater than 260 mg/l, then a concentration not to exceed 15 percent above this level is allowed. However, the discharge from the outlet shall not cause the sulfate concentration at Bremen to exceed 450 mg/l."

[¶ 22] The Health Department modified the permit based on new information, stating the specific conductance measurements were established at Flora and Bremen during 2005. The Health Department noted that before 2005, limited information was available at the point of discharge into the Sheyenne River, but the subsequent measurements revealed the natural background levels for sulfate at the discharge point were higher and more variable than previously known.

[¶ 23] In *Calcasieu League for Envtl. Action Now v. Thompson,* 661 So.2d 143, 148–50 (La.Ct.App.1995), the court considered a claim that a "new information" test was not met under a similar administrative regulation in the context of a modification of a hazardous waste disposal permit. There, a claim was made that the information justifying the modification was available when the original permit was issued. *Id.* at 149. The court was asked to decide whether the agency's determination that there was new information was arbitrary, capricious, or manifestly contrary to standards for modification. *Id.* The court concluded the agency's construction of its rules to authorize modification of the permit was not arbitrary, capricious, or contrary to standards for modification. *Id.* See also *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 372–85, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (agency decision not to prepare supplemental environmental impact statement under regulation requiring supplements for significant new circumstances or information relevant to environmental concerns required high degree of technical expertise and was not arbitrary and capricious).

[¶ 24] We conclude the Health Department was justified in treating the new readings from the gauges at Bremen and Flora as new information that was not available when the initial permit was issued and that would have justified different permit conditions. The sulfate levels involve technical information, and the record on this issue provides a rational explanation for the Health Department's decision to modify the sulfate limitations. We conclude the Health Department's decision to modify the sulfate limitations in the permit was not arbitrary, capricious, or unreasonable.

B

[¶ 25] Manitoba argues there is no basis in the regulations for the removal of the TSS limit and the change in the period of outlet operation because those changes were not prompted by "new information." Manitoba claims the Health Department did not use a "technical mistake" as a rationale to support its decision to modify the permit and that ground is simply an after-the-fact rationale that cannot support the Health Department's action. The Health Department responds that it had cause to modify the TSS limit and the period of operation. The Health Department claims that after the permit was issued, the Water Commission advised the Health Department that the Water Commission could not detect TSS fluctuations in real time and that a better standard, an operational one, required the discharge to be operated "in accordance with sound engineering practices to minimize contribution of suspended solids to the Sheyenne River." The Department asserts that information is either new information or a technical mistake.

[¶ 26]   A fact sheet for the modification of the TSS limit explained:

"The Department has reconsidered the technical basis for the current numeric limit and is proposing that the limit for TSS be revised in response to the modification request.

"The modification to the TSS limit is being proposed for the following reasons:   currently there are no TSS stream standards for Class IA streams in North Dakota; numeric TSS limits are typically applied to industrial applications such as mining operations, not water-to-water transfers and; the purpose and method for controlling TSS at this facility is more typical of discharges regulated through Best Management Practices (BMPs).

"The department will replace the numeric TSS limit in the Devils Lake outlet permit with a best management practice (BMP) requirements for the control of TSS.   The permittee will still be required to sample for TSS at the outlet structure.   In addition, best management practices will continue to be implemented as part of the operation and maintenance of the system to minimize any adverse effects on the Sheyenne River due to the contribution of sediment."

[¶ 27]   The Health Department's response to public comments about the TSS limit stated:

"There presently are no TSS stream standards for any classes of waters in North Dakota.   In addition, there are no effluent guidelines or permitting requirements for water-to-water transfers. Even specific sources regulated under the NDPDES Program (e.g., stormwater discharges) are required to implement best management practices (BMPs) in lieu of numeric effluent limits to prevent sediment impacts.

"The control of TSS in the outlet discharge is primarily achieved through proper design, operation and maintenance.   The outlet does not include features which can be, reasonably controlled to respond to sudden changes in TSS concentration caused by such events as natural variability or storm inflows.   As such, BMP requirements are more appropriate than numeric limits for controlling TSS in this discharge.

"The department intends to replace the 100 mg/L TSS limit with BMP requirements for the control of TSS as part of the permit modification.   As part of the operation and maintenance of the system, the permittee will be required to (1) implement BMPs to control TSS and (2) continue sampling for TSS at the outlet structure.   The department has chosen to use the former limit as a notification level to initiate a review of the system and BMPs."

[¶ 28]   Neither the Health Department nor the Water Commission have cited evidence in this record that shows information about TSS standards was not available when the initial permit was issued.   In the absence of any such evidence, the Health Department's decision to modify the TSS standard with a "more appropriate" method of monitoring under the auspices of new information was not the product of a rational mental process by which the facts and the law relied upon were considered together for the purpose of achieving a reasoned decision.   Therefore, the Health Department's reliance on new information to justify modification of the TSS standard is arbitrary, capricious, and unreasonable.

[¶ 29]   The Health Department also claims modification of the TSS standard was to correct a technical mistake under 40 C.F.R. § 122.62(a)(15), which refers to "technical mistakes, such as errors in cal-

culation, or mistaken interpretations of law made in determining permit conditions."

[¶ 30] One court has construed the "technical mistakes" to mean "only errors in mathematical calculations, computer errors, clerical mistakes, and the like." *Texas Mun. Power Agency v. Admin. of U.S. Envtl. Prot. Agency*, 836 F.2d 1482, 1491 (5th Cir.1988). In *Texas Mun. Power Agency*, at 1491, the Fifth Circuit Court of Appeals rejected an electric utility's argument that its request for modification regarding TSS limits constituted a technical mistake, stating the utility's argument would open the door to full judicial review of agency fact finding after the statute of limitations for review of the initial permit decision had run.

[¶ 31] Neither the Health Department nor the Water Commission have cited evidence in this record supporting a claim that the change in TSS standards constitutes an error in "mathematical calculations, computer errors, clerical mistakes, and the like" so as to constitute a technical mistake. Rather, this record reflects the Health Department modified the TSS standard solely because the Health Department decided best management practices was a "more appropriate" standard. We conclude modification of the TSS standard was not the product of a rational mental process by which the facts relied upon were considered together for the purpose of achieving a reasoned decision and was arbitrary, capricious, and unreasonable.

[¶ 32] Manitoba also argues the extension of the period of operation does not involve new information or a technical mistake. The Health Department responds it had cause to modify the operational period because "operations for the period from May through November are nothing more than a loose proxy for ice-free conditions" and "[s]ubstituting an operational period based on actual conditions improves flood-control, and constitutes the correction of a technical mistake."

[¶ 33] Although the Health Department's decision is entitled to `appropriate deference, there is no evidence in this record that modification of the period of operation involves information that was not available when the initial permit was issued or involves an error in mathematical calculation, computer error, clerical mistake, or the like. The explanation that the operational period in the initial permit was nothing more than a proxy for ice-free conditions does not support a determination of new information or a technical mistake. We conclude the decision to modify the period of operation of the permit does not constitute cause for modification of the NDPDES permit, as required by its regulations, and was arbitrary, capricious, and unreasonable.

V

[¶ 34] We affirm the district court judgment affirming the Health Department's decision about antidegradation requirements and the modification of the sulfate limitation in the permit, and we reverse the decision to modify the TSS standard and the period of operation and remand with instructions to remove the modifications for TSS and the period of operation for the permit.

[¶ 35] DANIEL J. CROTHERS and CAROL RONNING KAPSNER, JJ., concur.

VANDE WALLE, Chief Justice, concurring and dissenting.

■ [¶ 36] I agree with all of the majority opinion other than that part of section IV B concerning the period of operation. The current permit authorizes operation of the outlet from May to No-

vember. The Water Commission contends its purpose was and continues to be to allow discharge during the open-water season and that its request to amend the permit to allow operation during the ice-free portion of the year is simply reflective of that fact. Manitoba and the majority refer to the change as an "extension of the period of operation." Given the vagaries of North Dakota weather it is not clear to me that the ice-free period of the year will be greater than the May to November period of the year. The proposed change requires the application of common sense rather than the sophisticated and technical principles of "technical mistake" or "new information." I would therefore also affirm that portion of the district court judgment affirming the decision of the Department to modify the permit.

[¶ 37] DALE V. SANDSTROM and MARY MUEHLEN MARING, JJ., concur.